SKLAR WILLIAMS, PLLC
Crane M. Pomerantz
Nevada Bar No. 14103
410 S. Rampart Blvd., Suite 350
Las Vegas, Nevada 89145
Telephone:     702-360-6000
Facsimile:     702-360-0000
CPomerantz@sklar-law.com

OLSHAN FROME WOLOSKY LLP
Kyle C. Bisceglie (*pro hac vice to be submitted*)
Kyle J. Kolb (*pro hac vice to be submitted*)
1325 Avenue of the Americas
New York, New York 10019
Telephone:     (212) 451-2300
Facsimile:     (212) 451-2222
Kbisceglie@olshanlaw.com
Kkolb@olshanlaw.com
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| REMARK HOLDINGS, INC., a Delaware corporation; and KANKAN LIMITED., a British Virgin Islands company, <br><br> *Plaintiffs*, <br><br> v. <br><br> CHINA BRANDING GROUP LIMITED (IN OFFICIAL LIQUIDATION), an exempted Cayman Islands company acting by and through its joint official liquidators; ADAM ROSEMAN; JOINT OFFICIAL LIQUIDATORS, with no personal liability, HUGH DICKSON OF GRANT THORNTON SPECIALIST SERVICES (CAYMAN) LTD, a Cayman Islands company, and DAVID BENNETT OF GRANT THORNTON RECOVERY AND REORGANISATION LTD, a Cayman Islands company; and DOES 1 through 10, inclusive, <br><br> *Defendants*. | Case No. _____ <br><br> **COMPLAINT** <br><br> **JURY DEMANDED** |

1

4500581-11

Plaintiffs Remark Holdings, Inc. (f/k/a Remark Media, Inc.)("Remark") and KanKan Limited ("KanKan"), through their attorneys, hereby complain and allege against the above named Defendants as follows:

**PRELIMINARY STATEMENT**

1. This is an action for the rescission of a fraudulently obtained purchase agreement. In late 2015, Remark, a publicly traded technology company headquartered in Nevada, was courted by defendant Adam Roseman regarding a potential business combination with a trio of companies owned by Roseman's company, China Branding Group ("CBG"), which specialized in providing Western digital media content to the growing Chinese millennial marketplace. Before and during negotiations, Roseman made extensive representations that CBG's companies, known as FansTang, RAAD, and SNS, were an attractive and synergistic business acquisition for Remark, with sizable 2015 revenue. Roseman and other Defendants characterized their businesses as growing revenue in 2016 with an even brighter and more-promising future. Roseman represented repeatedly that these operating companies would substantially exceed the nearly $8 million in revenue earned in 2015; promising revenue over $12 million for 2016 as late as September 20, 2016. In fact, Roseman concealed that the companies Remark was acquiring were in the midst of a drastic decrease in annual revenue and other hidden operational difficulties. Revenue would only be $2.9 million in 2016. Once this fraud began to come to light, Roseman abruptly quit his newly-negotiated employment with Remark to run a new venture he surreptitiously formed during the negotiations of the sale of CBG to Remark. Left with the debris from this house of cards, Plaintiffs now seek the rescission of the transaction, disgorgement of consideration and compensation paid, and an Order from the Court declaring that it is under no obligation to deliver warrants for Remark stock that were part of the negotiated purchase price of CBG.

**THE PARTIES AND RELATED ENTITIES**

2. Plaintiff Remark is a corporation organized under the laws of Delaware with its principal place of business in Las Vegas, Nevada. Remark is publicly traded on NASDAQ using the ticker symbol MARK.

2

4500581-11

3. Plaintiff KanKan is a company organized under the laws of the British Virgin Islands with its principal place of business in Las Vegas, Nevada. KanKan is an indirect wholly-owned subsidiary of Remark.

4. Defendant China Branding Group Limited (In Official Liquidation) is an exempted company organized under the laws of the Cayman Islands with its principal place of business formerly in Los Angeles, California ("CBG"), with no current place of business.  CBG acts by and through its Joint Official Liquidators, with no personal liability, Hugh Dickson of Grant Thornton Specialist Services (Cayman) Ltd, 10 Market Street #765, Camana Bay, Grand Cayman, Cayman Islands KY1 9006 and David Bennett of Grant Thornton Recovery and Reorganisation Ltd, 12th floor, 28 Hennessy Road, Wanchai, Hong Kong (the "Joint Official Liquidators" or "JOL"). The Joint Official Liquidators are also named as defendants in this action.

5. Defendant Adam Roseman is an individual residing in or around Atlanta, Georgia. Roseman is defined as Seller Management in the Second Amended and Restated Asset and Securities Purchase Agreement (the "Purchase Agreement"), is entitled to receive warrants under the Purchase Agreement, and is a Contributor under the Asset Sale Realisation Distribution Agreement dated September 20, 2016 (the "Distribution Agreement"). Roseman received $491,877 in management incentive payments and other consideration in accordance with the Purchase Agreement upon closing.

6. The true names and capacities, whether individual, corporate, associate, or otherwise of the defendants sued herein as Does 1 through 10, inclusive, are unknown to Plaintiffs, who therefore sue those defendants by such fictitious names. Plaintiffs are informed and believe and thereon allege that each of the defendants sued herein under fictitious names is contractually, negligently, intentionally, strictly or vicariously liable and/or otherwise legally responsible for each and every act, omission, obligation, event or happening set forth in this Complaint. Plaintiffs will seek leave of court to amend this Complaint to allege the true names of those Doe defendants when the same have been ascertained. The use of the term "Defendants" in any of the allegations set forth in this Complaint, unless specifically otherwise set forth, is intended to include and charge both

4500581-11

jointly and severally, not only named defendants, but all defendants designated as Does 1 through 10, inclusive.

7. RAAD Productions, LLC is a limited liability company organized under the laws of California with its principal place of business in Los Angeles, California ("RAAD"). RAAD is a Target Entity in the Purchase Agreement which was acquired by Plaintiffs from CBG.

8. China SNS Group Limited is a private company limited by shares registered in Hong Kong with its principal place of business in Hong Kong ("SNS"). SNS is a Target Entity in the Purchase Agreement which was acquired by Plaintiffs from CBG.

9. FansTang (Shanghai) Entertainment Information Consulting Co. Ltd. is a Chinese limited liability company with its principal place of business in Los Angeles, California ("FansTang," and collectively with RAAD and SNS, the "Target Entities"). FansTang is a Target Entity in the Purchase Agreement which was acquired by Plaintiffs from CBG. Roseman served as FansTang's CEO from January 2012 until May 2017.

10. Roseman founded the Target Entities, as well as CBG.

**JURISDICTION AND VENUE**

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 and the diversity allegations set forth herein. The amount in controversy exceeds $75,000, exclusive of interests and costs. All of the parties to the action are diverse from each other.

12. Venue for this action is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and (c).

**FACTUAL ALLEGATIONS**

**A. Remark Seeks to Expand Further into China**

13. Remark is a global technology company that focuses on the development and deployment of artificial-intelligence-based solutions for businesses in many industries. Remark also owns and operates digital media properties that deliver relevant, dynamic content. Including www.vegas.com, one of the leading online travel and entertainment sites for Las Vegas.

14. KanKan is a wholly-owned subsidiary of Remark Holdings, Inc.

4

15. In 2015, Plaintiffs were hoping to expand their presence in China, especially among millennials, and started looking for a potential business combination to achieve this result.

16. FansTang was supposed to be a top provider of localized Western sports and entertainment digital video content, international live event broadcasts, and social media content to China. FansTang purportedly had more than 130 million followers in China, and purportedly held the exclusive China media rights to many of the world's top live events, including the Primetime Emmy Awards, Billboard Music Awards, People's Choice Awards, American Music Awards, Golden Globes Awards, Dick Clark's New Year's Rockin' Eve, and the Grammy Awards.

17. FansTang had sponsorships with powerful brands such as Coca-Cola, Red Bull, VitaCoco, AB InBev, and the Los Angeles Tourism & Convention Board, among others. FansTang was held out to be a remunerative acquisition for Plaintiffs.

18. RAAD is a production company located in Los Angeles, California. RAAD was primarily responsible for filming the events that FansTang held the rights to, which it would then send to SNS, in Hong Kong, to stream online or broadcast to Chinese audiences. The Target Entities (FansTang, RAAD, and SNS) worked together to film and stream American content to China.

**B.    Defendants Court Remark to Acquire the Target Entities**

19. Remark began negotiations with Roseman in 2015 to acquire the Target Entities. CBG, through Roseman, was quick to make statements regarding the Target Entities' performance, indicating the Target Entities' ever-increasing business success.

20. Roseman was enthusiastic to begin formal negotiations, and offered Plaintiffs assurances at every turn. He quickly provided Plaintiffs with repeated and continued updates about the growth of the Target Entities' businesses, promising continued purported growth over 2015's revenues. Over the course of multiple meetings between Plaintiffs' representatives and Roseman, including several that took place at Remark's headquarters in Las Vegas, Remark began to finalize the structure of a potential business combination.

5

4500581-11

21. The parties executed a letter of intent in late February 2016, and continued formal negotiations and due diligence thereafter. CBG's counsel drafted the initial draft of the purchase agreement, which was exchanged in March 2016.

### C. The Parties Finalize Remark's Purchase of the Target Entities

22. On May 18, 2016, Remark publicly announced that it had signed a definitive purchase agreement dated as of May 16, 2016, by which it would acquire the Target Entities from CBG. The parties expected the deal to close by June 30, 2016.

23. After this deal was announced, the majority shareholder, Hickory Grove, LLC, of CBG objected to the deal. As a result, CBG was placed into provisional liquidation by order of the Grand Court of the Cayman Islands on June 2, 2016. The Court's order appointed joint provisional liquidators to oversee CBG's liquidation.

24. On July 12, 2016, Remark announced that it had amended the purchase agreement with CBG, to reflect, among other things, the placement of CBG into provisional liquidation. CBG was later placed into official liquidation by the Cayman Islands courts.

25. Remark's acquisition of CBG and the Target Entities closed on September 20, 2016. In connection with the closing, and on the same date, the parties also amended the prior purchase agreement, and entered into the Second Amended and Restated Asset and Securities Purchase Agreement dated as of September 20, 2016 (the "Purchase Agreement"), to which the JOLs were also a party.

26. By the Purchase Agreement, Plaintiffs paid $7.5 million in cash to CBG, and agreed to deliver warrants to be issued over a seven-year period for the purchase of up to 5,750,000 shares of Remark common stock at an exercise price of $10.00 per share (the "Warrants"). To finance the deal, Remark amended its financing agreement to add $8 million in additional principal, in exchange for modifying certain covenants to the financing agreement.

27. The Purchase Agreement is governed by Delaware law.

28. Simultaneously with the Purchase Agreement, CBG entered into an Asset Sale Realisation Distribution Agreement dated September 20, 2016 (the "Distribution Agreement") by and between CBG and certain seller indemnitors, as well as Roseman for and on behalf of the

contributor employees. By the Distribution Agreement, the indemnitors agreed to distribute the sale proceeds (whether paid in cash, warrants, or other financial instruments) received by CBG from Remark pursuant to the Purchase Agreement on a *pari passu* basis, including to the contributor employees pursuant to the Management Incentive Payments they were entitled to under the Purchase Agreement.

### D. Defendants' Representations in the Purchase Agreement

29. The Purchase Agreement requires that any claim for breach of a representation, warranty, or covenant therein be brought pursuant to its indemnification procedures. Acts of fraud, willful misconduct, or intentional or grossly negligent misrepresentation are not subject to this exclusive remedy provision. The seller indemnitors remain liable for either (i) breach of certain representations in the Purchase Agreement, or (ii) instances of fraud, intentional misrepresentation, or willful misconduct that are the direct and proximate cause of damages.

30. Roseman, as CBG Management, represented and warranted to KanKan (Remark's acquisition vehicle in the transaction) that the statements contained in Article IV of the Purchase Agreement (Representation and Warranties of Seller Management) were true and correct as of September 20, 2016 (the "Representations").

31. In section 4.05 of the Representations, Roseman represented and warranted that section 4.05 of the attached disclosure schedule (the "Disclosure Schedule") set forth "true, complete, and correct copies of the respective unaudited management accounts for [CBG], each of the Target Entities and their respective Subsidiaries as of December 31, 2015 and the related statements of income" for the same period (the "2015 Financial Statements").

32. Roseman further represented and warranted that the 2015 Financial Statements:

> were prepared from the books and records of [CBG] and the Target Entities, are accurate and complete in all material respects, fairly present, in all material respects, the financial position of [CBG], the Target Entities and their Subsidiaries as of the date thereof and for the periods covered thereby, and the results of operations and cash flows of [CBG], the Target Entities and their Subsidiaries as of the date thereof or for the respective period set forth therein, in conformity with GAAP, all as consistently applied during the periods involved.

7

4500581-11

33. The 2015 Financial Statements disclosed $7,435,498 in total annual revenue.

34. Additionally, Roseman made representations that the Target Entities' businesses had not changed in any material respect since the time of the 2015 Financial Statements.

35. The Target Entities also covenanted and agreed that they would conduct their business in the ordinary course and were using commercially reasonable efforts.

36. Upon announcing the completion of the acquisition, Roseman stated that the acquisition would "further jumpstart [the Target Entities'] growth," promising that they were "soon launching a number of new branded content initiatives, and [the Target Entities'] current programming continues to grow in both audience and monetization." Roseman further beamed that "it couldn't be a better time for this acquisition to be taking place."

37. In Section 4.12, Roseman represented and warranted that the Target Entities have timely filed all tax returns and timely paid all taxes.

38. The facts prove these representations were false.

**E.  Defendants' Intentional Misrepresentations and Omissions that Induced Plaintiffs to Enter into the Purchase Agreement**

39. During the course of negotiations, Plaintiffs' independent accountant confirmed that the 2015 Financial Statements, which were prepared by CBG's financial advisor, were reasonably accurate records of the Target Entities' 2015 financial performance.

40. Plaintiffs also reasonably relied upon Defendants' representations in the Purchase Agreement that the Target Entities were being operated in the ordinary course in 2016, and that their financial conditions had not, and were not reasonably likely to, have a Material Adverse Effect as defined therein.

41. Further, Plaintiffs accepted and reasonably relied upon the 2015 Financial Statements' portrayal of the Target Entities' business and representations made by Roseman that the businesses would be operated in a commercially reasonable fashion during 2016 to achieve no less than the revenue booked in 2015 and forecasted $12.2 million by the end of the year.

42. After making these representations in the first purchase agreement entered into in May 2016, Defendants stood by these representations in the exact same form in the July 2016 purchase agreement, and the final Purchase Agreement in September of 2016.

43. As set forth below, prior to the closing, Defendants repeatedly stated that business was booming, without any indication that the Target Entities were falling far short of not only the $12.2 million revenue target for 2016, but also the $7.435 million revenue actually achieved in 2015. Defendants' numerous and repeated statements to Remark boasting about the Target Entities success were seriously misleading. Indeed, their year-to-year revenue fell over 60% from 2015 to 2016. By the close of 2016, the Target Entities had only achieved $2.9 million in total revenue.

44. Defendants intentionally hid and actively concealed these facts from Plaintiffs at every turn. Instead, Defendants repeatedly claimed to be beating expectations and provided Plaintiffs with detailed updates regarding the status of contracts, content creation for their campaigns, and new client development.

45. At a minimum, these statements were grossly negligent and/or recklessly indifferent to the truth.

46. Roseman served as the sole principal of the Target Entities that communicated with Plaintiffs and their representatives and advisors in connection with the negotiations and diligence. Roseman thus acted as the conduit upon which Plaintiffs came to rely for information regarding the Target Entities.

47. Defendants' misrepresentations include the following statements:

    (a) Roseman stated that the Target Entities had entered into a substantial sponsorship contract with VitaCoco, which was supposed to start in February 2016. Roseman described this contract as a "material asset" in January 2016, and days later sent the executed contract to Plaintiffs. Through this agreement, VitaCoco would be a sponsor of the weekly This Week in Hollywood show. In reality, however, the contract did not begin until May 2016, a fact never disclosed to Plaintiffs at the time. And yet, in a March 29, 2016 due diligence response, Roseman described the VitaCoco contract as a

key driver of advertiser revenue growth. On April 29, 2016, Roseman provided a summary of the terms of the contract, without mentioning that it had yet to be performed. On May 6, 2016, Roseman stated that the Target Entities were already filming for the VitaCoco contract, and were "ahead of schedule" with the deliverables. It was not until October 2016 that Roseman disclosed for the first time that the contract's start date was delayed. Remark did not start collecting cash from that contract until 2017.

(b) On February 1, 2016, Roseman delivered a revenue pipeline for 2016, establishing $11 million of bookings revenue that would be recognized in 2016. Roseman stated that sales have "increased dramatically" and that this pipeline was "not exhaustive."

(c) On February 5, 2016, Roseman told Plaintiffs that a new partner, MGM, was "locked for USD$100k" for a new test content campaign surrounding the Billboard Awards. If that campaign went well, Roseman promised, MGM would enter into a "consistent content endeavor." Roseman affirmed that this was final in a March 6, 2016 email to Plaintiffs. In fact, this contract never materialized, and Plaintiffs were never informed.

(d) On February 8, 2016, in response to Plaintiffs' due diligence requests, Roseman provided a revenue breakdown for 2013, 2014, and 2015. Based on this, CBG achieved revenues of $3,873,724 in 2013, $6,393,666 in 2014, and $7,435,498 in 2015. Roseman noted that the gross margins and EBITDA margins for 2016 were "ahead of expectations" due to the "historically bootstrapped nature" of the business.

(e) Plaintiffs were also told to expect a "significant uptick" in revenue on February 12, 2016, from the Los Angeles Tourism & Convention Board (on which Roseman sat) beginning in July 2016. However that uptick in revenue never materialized. After Roseman left Remark in May 2017, the Tourism & Convention Board chose not to renew its sponsorship.

4500581-11

(f) On February 23, 2016, Roseman stated that the Target Entities would also be providing content for the broadcasts in Asia of the World Football Awards and NBA Honors Awards through their partnership with Dick Clark Productions and Rock in Rio. Roseman noted that this was not yet factored into their financial modeling.

(g) On March 6, 2016, Roseman reported that the Target Entities' initial collaboration with Hard Rock Café was a success, and they would be expanding their partnership to include the Billboard Music Awards. Based on this growth, their revenue from the Billboard Music Awards was "up at least 100% for us year/year."

(h) After meeting in-person with Plaintiffs, Roseman provided an updated 2016 financial model for FansTang on March 12, 2016. This model showed $3,873,724 in actual revenue in 2013, $6,621,442 in actual revenue for 2014, and $7,722,617 in estimated revenue for 2015. Roseman projected $12,880,000 revenue in 2016, and $20,378,000 in 2017. Roseman described these figures as the "base case" and that after the combination, he would be able to focus on securing even better sales. Roseman also stated that the 2015 revenue figure was "final."

(i) On April 6, 2016, Roseman stated that "[c]onservatively," 2016 revenues based off deals with major international brand/agency counterparties "contracted or terms agreed" would be $8.9 million; Roseman added that he felt "comfortable" with revenue increasing to $10.5 million and that "number will continue to grow."

(j) On May 18, 2016, Roseman provided an updated FansTang standalone financial model for 2016 through 2018. Roseman's projections had decreased only slightly, with revenue projections of $12,200,000 in 2016, $17,538,000 in 2017, and $21,723,475 in 2018.

  (k) On June 10, 2016, Roseman provided updated contracts and first quarter financials for the Target Entities reflecting $1.359 million in quarterly revenue, stating they are "very much on track or ahead of our estimates for this year" and were looking forward to the deal closing.

  (l) On June 10, 2016, Roseman reassured Remark writing by email "[w]e feel very much on track or ahead of our estimates for this year" and again on June 25, 2016, stating "[w]e are actually going to have a very strong balance sheet at closing, as you will see."  In fact, the balance sheet and other financials were materially worse than what was represented.

  (m) On August 29, 2016, Roseman delivered an updated income statement with $4.2 million of revenue in the fourth quarter of 2016 alone. In delivering this figure, Roseman noted that they had "over delivered" in the third quarter.

  (n) On the same day as the announcement of the deal's closing on September 20, 2016, Roseman sent an updated financial model of the Target Entities, wherein they were projected to have $12.2 million in total revenue in 2016. Plaintiffs believed this was in line with Defendants' 2015 revenue of nearly $8 million, coupled with Roseman's repeated representations that the Target Entities were entering into new deals throughout 2016 that would represent material growth for their businesses.

48. These representations were material to Plaintiffs decisions to enter into the purchase agreements, and to allow the transaction to close.

49. Defendants dragged out diligence, providing contracts only in Chinese or not at all, and offering a myriad of vague statements regarding the status of contracts and business development.

50. During the course of closing the deal, Plaintiffs repeatedly asked questions that should have elicited from Defendants information sufficient to understand that this business growth was largely fiction.

4500581-11

51.     Defendants intentionally made these misrepresentations or omissions with knowledge that they were false, or with a reckless indifference to the truth, and actively concealed material facts from Plaintiffs.

52.     As Defendants intended them to do, Plaintiffs reasonably relied on these representations to their detriment, and the transaction closed in accordance with the requirements of the Purchase Agreement.

53.     Remark paid $550,050 in management incentive payments, placed $375,000 and were scheduled to place warrants for 312,500 Remark shares into Escrow, made other payments required under the Purchase Agreement, and wired the Joint Official Liquidators over $5.7 million.

54.     Further, under section 7.02(i) of the Purchase Agreement, Remark was obligated to obtain financing sufficient to pay all cash consideration required under the Purchase Agreement. To obtain that financing, Remark issued warrants for 2,670,736 shares with a $5.50 exercise price and has paid $1,241,424.44 in interest on the loan increase as of February 1, 2018, which is continuing going forward.

**F.     Plaintiffs Uncover Defendants' Fraud**

55.     Roseman was employed by Remark post-acquisition for approximately 8 months, purportedly in order to continue to run the Target Entities and achieve the growth promised.

56.     After the closing, Plaintiffs began to learn of troubling operational and financial issues that were hurting the Target Entities' bottom lines. As these concerns grew, Defendants at times became defensive about their prior optimism and failure to disclose any issues with the Target Entities' businesses or that any of their contracts had fallen through or not become payable. In fact, Plaintiffs learned that much of the purported business that Roseman had discussed at length over the prior months had never even been invoiced to the clients.

57.     Nonetheless, Roseman continued to promise growth in 2017, going so far as to again project nearly $17 million in revenue in 2017.

58.     After year-end of 2016, Plaintiffs took it upon themselves to further investigate the issues with the Target Entities' businesses. Although in August 2016 Defendants had provided Plaintiffs with an estimated $4.95 million in revenue for September through December 2016—thus

representing an annualized revenue of nearly $15 million—the preliminary actual revenue for that same four month period was only $589,000 or approximately 1/9th of what was projected.

59. In March 2017, as Plaintiffs demanded additional information regarding CBG's financial performance (including relevant bank statements, total revenue, and cost of sales and expense), Roseman, as advised by the JOLs, refused. Roseman blamed the Target Entities' extreme underperformance on trivial issues such as delays in his employee receiving travel reimbursements, and took no accountability for the Target Entities' failures, misrepresentations, and omissions.

60. Roseman admitted at the end of March 2017 that his prior projections and statements were unreliable, self-servingly stating to Plaintiffs for the first time that:

> [O]ur business is very difficult to measure on a quarterly basis and this needs to be discussed with each member of the team and figured out how to communicate. It is very easy to miss by 50% one quarter and over-perform by 200% the next quarter and it is very difficult to exactly forecast this.

61. Yet, Roseman had previously provided projections and statements with the intent that Plaintiffs would rely on them. Had Plaintiffs known that the consistent projections delivered by Roseman were subject to wild swings or were otherwise "very difficult" to forecast, they would not have pursued the transaction on the terms agreed upon.

62. Moreover, unbeknownst to Plaintiffs, Roseman had turned his attention to a new venture, "Steady," which upon information and belief he had surreptitiously been developing during the time he was employed with Plaintiffs. Roseman quit his employment with Remark in May 2017.

63. Since leaving Remark's employment, in October 2017 Roseman publicly admitted that he founded Steady in "stealth mode" 18 months beforehand—namely, prior to the first purchase agreement even being signed. Thus, while simultaneously promising steady growth at the Target Entities and actively concealing the material facts disclosing otherwise, Roseman was working behind the scenes on his exit path.

64. Plaintiffs later learned that the Target Entities had failed to pay taxes in the amount of $421,459 arising pre-transaction. Plaintiffs were required to pay the withholding taxes in

1  January 2018 and will be paying the income taxes related to 2015 and 2016 when they file their tax
2  return for this year.  Likewise, Plaintiffs learned of many additional issues that should have been
3  but were not disclosed prior to Closing Date, including but not limited to, the Target Companies'
4  undisclosed litigation, failure to pay indebtedness and failure to comply with laws.

**G.    Dispute Arises**

65.    Prior to the time for delivery of all the remaining Warrants, pursuant to the requirements of the Purchase Agreement, Plaintiffs sent a notice of indemnification claim to CBG with respect to the fraud described herein on December 19, 2017, and advised that Plaintiffs were "evaluating possible claims of intentional misrepresentation which may result in cancellation of the Warrants."

66.    In response, the JOLs through purported counsel demanded assurances on December 21, 2017 that the Plaintiffs would deliver warrants and threatened to hold Plaintiffs responsible for "breach of contract" for failure to do so.  The JOLs have since demanded in writing on both January 22, 2018 and February 6, 2018 that Plaintiffs issue and deliver certain warrants to the Target Entities' largest creditor, a Nevada limited liability company named Hickory Grove, LLC, to purchase 500,000 Remark shares of common stock and issue approximately 280,000 shares of Remark common stock to CBG.

67.    Further, Plaintiffs and the JOLs have exchanged notices pertaining to the consideration from the transaction held in Escrow.  Specifically, Plaintiffs made a Notice of Claims on December 14, 2017, made under the Purchase Agreement arising from Changes Materially Affecting Business, Taxes, Material Adverse Effect, Litigation, Failure to Pay Indebtedness, and Compliance with Laws.  The JOLs belatedly sent a Contest Notice in and around January 17, 2018, contesting all claims made.  Pursuant to the Escrow Agreement, Plaintiffs and the JOLs were obligated to "negotiate in good faith" regarding the claims and amount.

68.    To date, the Warrants—the 5,397,500 shares of which were to become due on December 20, 2017—have not been delivered nor have the 312,500 warrants that were supposed to be delivered into escrow.

4500581-11

## FIRST CAUSE OF ACTION
**(Fraud and Intentional Misrepresentation)**

69. Plaintiffs repeat and re-allege the allegations set forth in the foregoing paragraphs as though fully set forth herein.

70. Defendants intentionally made numerous false statements of material fact and omissions of fact necessary in order to make statements not misleading in light of the circumstances in which they were made.

71. These misstatements and omissions concerned matters of fact known by Defendants to be false, specifically concerning the Target Entities' performance in 2016 and business actually secured. These misstatements and omissions were material. Defendants were fully aware of the false and material nature of the misrepresentations and omissions, or did so in reckless disregard for the falsity of their representations.

72. Defendants made numerous false statements of fact specifically designed to conceal that the Target Entities' performance had plummeted in 2016, including but not limited to, the communications described herein.

73. Defendants had a duty to disclose to Plaintiffs all material facts relating to the Target Entities' performance because they possessed exclusive knowledge of this information, not ascertainable by Plaintiffs, and moreover knew that Plaintiffs were acting on the basis of mistaken knowledge.

74. Defendants' false and misleading statements and omissions were specifically intended to and did cause Plaintiffs directly and proximately to rely on them, to acquire the Target Entities, and to agree to issue the warrants at a price far in excess of their true value. Had accurate, correct and complete information been disclosed to Plaintiffs by Defendants, Plaintiffs would not have purchased the Target Entities for the purchase price, or possibly not at all.

75. Plaintiffs relied on those representations to their detriment. Defendants knew of such reliance but failed to correct the false representations, all the while knowing they were false, or while recklessly indifferent to the truth. In reliance on false representations and omissions made by Defendants, Plaintiffs set the Purchase Agreement's consideration value far in excess of the

4500581-11

transaction's true value and ultimately paid far more than they would have agreed to pay had Defendants disclosed the true facts.

76. As a direct and proximate result of the foregoing fraudulent conduct, rescission is required due to the intentional misrepresentations and omissions of material fact made by Defendants and their agents and the reasonable reliance thereon by Plaintiffs.

77. As parties fraudulently induced to enter into a contract and consummate the related transactions, Plaintiffs are entitled to rescind the Purchase Agreement and those related transactions.

78. It is possible for the Court to place the parties in *status quo ante* through an award of rescission.

79. Plaintiffs cannot be made whole by a monetary judgment and a monetary award will not restore Plaintiffs to their original condition.

80. For the same reasons, Plaintiffs are likewise entitled to disgorgement of all consideration paid.

81. Accordingly, Plaintiffs asks this Court to rescind the Purchase Agreement and related transactions, declaring that the Purchase Agreements and the transactions consummated pursuant thereto be rescinded and void *ab initio* and ordering Defendants to disgorge any and all consideration paid.

**SECOND CAUSE OF ACTION**
**(Declaratory Judgment)**

82. Plaintiffs repeat and re-allege the allegations set forth in the foregoing paragraphs as though fully set forth herein.

83. There exists a justiciable controversy concerning whether Plaintiffs are obligated to deliver the Warrants despite Defendants' fraud.

84. Plaintiffs have a legally protectable interest in the controversy at issue in this case, because Plaintiffs are a party to the Purchase Agreement and currently hold 5,710,000 Warrants.

85. Given that the Purchase Agreement calls for delivery of Warrants, the JOLs have sent multiple demands for issuance of Warrants and an amount of Warrants reside in Escrow, which the JOLs also seek, the controversy at issue is ripe for judicial determination.

17

86. Plaintiffs are entitled to declaratory relief pursuant to 22 U.S.C. § 2201 to declare and construe their rights under the Purchase Agreement.

87. Plaintiffs seek a declaratory judgment that Plaintiffs are under no obligation to deliver the remaining Warrants, and that Plaintiffs are entitled to return all of the Warrants that have been issued, including those held in Escrow.

88. Plaintiffs cannot be made whole by a monetary judgment and a monetary award will not restore Plaintiffs to their original condition.

WHEREFORE, Plaintiffs respectfully request the Court enter judgment against Defendants awarding Plaintiffs all appropriate relief, including:

A. Rescission of the Purchase Agreement and the related transactions (including return of the amount held in escrow), and a declaration that the Purchase Agreement and the transactions consummated pursuant thereto be rescinded and void *ab initio*;

B. Declaring that Plaintiffs are not required the deliver the remaining Warrants;

C. Order directing Release of any consideration held in Escrow to Plaintiffs;

D. Disgorgement of all consideration paid, as well as any other rescissory damages Plaintiffs are entitled to under applicable law, including but not limited to, the $421,459 Plaintiffs paid in back-taxes for the Target Entities, the amounts paid for loan origination including costs such as, the $1,241,424.44 interest paid on additional loan amounts plus the warrants issued in connection with origination of the loan, and the $491,877 Plaintiffs paid to Roseman in compensation and incentive payments;

. . .

. . .

. . .

4500581-11

E.  An order awarding Plaintiffs' costs of the proceedings herein, including reasonable attorneys' and experts' fees and expenses; and

F.  Such other and further relief as the Court may deem just and proper.

Dated: February 21, 2018

Las Vegas, Nevada

SKLAR WILLIAMS, PLLC

By: _____
Crane M. Pomerantz
Nevada Bar No. 14103
410 S. Rampart Blvd., Suite 350
Las Vegas, Nevada 89145
Telephone: 702-360-6000
Fax: 702-360-0000
CPomerantz@sklar-law.com

OLSHAN FROME WOLOSKY LLP
Kyle C. Bisceglie (*pro hac vice to be submitted*)
Kyle J. Kolb (*pro hac vice to be submitted*)
1325 Avenue of the Americas
New York, New York 10019
(212) 451-2300
(212) 451-2222
kbisceglie@olshanlaw.com
kkolb@olshanlaw.com

*Attorneys for Plaintiffs*

4500581-11